UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-81234-CIV-HURLEY

BLUESKY GREENLAND ENVIRONMENTAL
SOLUTIONS, LLC,
    plaintiff,

vs.

21ST CENTURY PLANET FUND, LLC,
HBL POWER SYSTEMS, LTD.,
GREGORY E. GEORGAS,
MICHAEL P. HOBAN,
VENKAT KUMAR TANGIRALA and
RAVI KUMAR TANGIRALA,
    defendants.
_____/

ORDER DENYING DEFENDANT 21ST CENTURY PLANET FUND LLC and
GREGORY GEORGAS' MOTION FOR SUMMARY JUDGMENT [ECF No. 32]

**Preface**

    Plaintiff Bluesky Greenland Environmental Solutions, LLC ("Bluesky") is suing the above-named defendants for (1) common law fraud (2) civil conspiracy (3) unjust enrichment and (4) tortious interference following the loss of its master distributorship contract with Rentar Environmental Solutions, Inc. ("Rentar").[1] Defendants 21st Century Planet Fund LLC ("21st Century/Delaware") and Gregory E. Georgas ("Georgas") previously moved to dismiss the plaintiff's first amended complaint for failure to state a claim under Rule 12(b)(6) [ECF 32], and the court converted the motion into one for summary judgment and gave the parties the opportunity to file additional evidence and argument. Following extended discovery, submission of supplemental briefing and lengthy oral argument on the issues raised, the court granted plaintiff's request to file a

---

[1] Rentar was earlier dismissed as a party defendant based on improper venue [ECF 58].

second amended complaint to more specifically set forth the factual predicate for its fraud-based claims, to better articulate its evolving theory of the case, and to conform the pleadings to the evidence. The plaintiff has since filed its second amended complaint [ECF 150] which the court accepts as the plaintiff's operative pleading. Having carefully considered the substantial evidence developed on the summary judgment record, together with the parties' supplemental briefing and presentations at oral argument, the court has concluded that the defendants' motion for summary judgment should be denied.

## I.  Fact Background[2]

Bluesky is a Texas limited liability company formed for the purpose of marketing and exporting environmentally-friendly products and services. On October 15, 2007, Bluesky entered into a three-year "Master Distributor Agreement" ("Bluesky MDA") with Rentar Environmental Solutions Inc. ("Rentar"), the manufacturer of a pre-combustion fuel catalyst device designed to enhance combustion, resulting in increased fuel efficiency and emissions reduction. Rentar markets its product worldwide through independent wholesale distributors, such as Bluesky. Under the Bluesky MDA, Bluesky was assigned the "non-exclusive territory" of the "U. A.E. [United Arab Emirates], Qatar, Pakistan, Bangladesh and Saudi Arabia," with the following caveat:

> It is not the intention of Rentar to assign these territories to another distributor, but the territories remain non-exclusive.

[ECF 138-1, p. 43].

---

[2] The recited facts, drawn from the parties' submissions on the converted summary judgment motion and the allegations of the plaintiff's second amended complaint, are either undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted.

2

The Bluesky MDA contained a "merger and integration clause," including a requirement that any amendment to the agreement be in writing:

> Any modification to this Agreement must be in writing and signed by all parties to this Agreement.  Other than the terms of this Agreement, no verbal or written promises, representations, guarantees or agreements exist or are being relied upon. This Agreement supersedes any prior agreement and is not transferable.  If any term of this Agreement is found to be unenforceable, the other terms of this Agreement shall remain in full force and effect.  Fax signature is acceptable to all parties.

[MDA, paragraph 20].

The Bluesky MDA prescribed a contractual term of three years, with provision for automatic annual renewal thereafter [MDA § 4], subject to the ability of either party to terminate the agreement at will at any time with advance written notice [MDA § 16].

Although India was not included in Bluesky's designated sales territory, it is plaintiff's contention that the agreement was subsequently modified, orally and by a continuing course of conduct between the parties, to add India to Bluesky's non-exclusive territory.  Thus, Bluesky contends that it began focusing its marketing efforts on the Indian market as early as December 2007; that Rentar was aware of and encouraged these efforts; that in December 2008, Rentar described Bluesky to prospective customers as Rentar's "Distributor for India and the Middle East" [ECF 153, p. 5; ECF 92-2, p. 25]; that Bluesky developed contacts in India which it identified on customer lists provided to Rentar for inclusion in Rentar's "Registry," the formal mechanism by which Rentar distributors identified sales contacts cultivated in non–exclusive sale territories in order to protect their entitlement to commissions on future sales generated from those contacts; that in June 2009 Bluesky supplied a customer list to Rentar which included an entity named HBL Power Systems Ltd. ("HBL"); that when Bluesky's managing member, Abid Ansari, complained to Rentar about another

3

distributor holding itself out on the Internet as Rentar's "exclusive" Indian agent, Brian Gibbons, Rentar's Senior Vice-President and COO, assured him that the misstatement would be corrected and that, in any event, Gibbons would ensure that all future inquiries from the Indian market would be channeled directly to Ansari and that Bluesky's economic interests in India would always be protected.

Between October 2007 and October 2010, Bluesky expended $250,000.00 to develop a customer base in the Indian market, developing consumer good will and Rentar brand recognition through on-the-ground field research projects and free trial offers. Notably, Bluesky provided free trials of the Rentar catalyst unit to "APSRTC," a government-owned bus company with a fleet of 23,000 buses.

In March 2010, Gregory Georgas ("Georgas"), a Florida businessman, created 21st Century Planet GP Ltd., a Cayman Islands limited partnership, for potential foreign business and investment. Georgas was the sole and managing member of 21st Century GP Ltd., which Georgas states "has been referred to as "21st Century Planet Fund, LP." [Affidavit of Georgas; ECF 106-2, ¶ 3].[3] Without passing on the legal significance of this casual shift in nomenclature, based on Georgas' affidavit, the court shall presume that "21st Century Planet Fund, LP" functions as a fictitious name for 21st Century Planet GP Ltd., and shall refer to it within the confines of this summary judgment proceeding as "21st Century/Cayman." About this same time, Georgas met Richard Ford, Rentar's President, and offered the services and valuable political connections of 21st Century/Cayman as a

---

[3] It is not clear if Georgas is suggesting that 21st Century Planet GP Ltd. is or was doing business as 21st Century Planet Fund LP, under what circumstances the former entity has been "referred to" as "21st Century Planet Fund, LP," or why a change in nomenclature was employed in the first instance to differentiate the activities of the former. Georgas further avers that 21st Century Planet GP Ltd. is still in existence, but it is not clear whether "21st Century Planet Fund LP" – the party named in the contracts with Bluesky and Rentar at issue in this case -- is, or ever was, in existence.

medium for marketing the Rentar fuel catalyst in the United States and throughout the world.

On June 10, 2010, Georgas individually purchased 100,000 common shares of Rentar at a cost of $1 per share, with an option to purchase an additional 400,000 shares by December 30, 2010 at the same price.

Two weeks later, on June 24, 2010, 21st Century/Cayman entered into a "Reseller Agreement, International" which authorized 21st Century/Cayman to market and distribute Rentar products in India, described in the agreement as a non-exclusive territory. On July 5, 2010, 21st Century/Cayman entered into a "Master Distributor Agreement" which authorized 21st Century/Cayman to market and distribute Rentar products in the non-exclusive territory of the United States and Canada [ECF 106-2].

Before forming these contractual ties with Rentar, in January 2010, 21st Century/Cayman contracted with Edge Solutions, LLC ("Edge Solutions"), to secure technical guidance, consultation and assistance in developing renewable energy ventures with the United States government. Michael Hoban was and is the managing partner of Edge Solutions. On July 1, 2010, 21st Century/Cayman expanded its consulting agreement with Edge Solutions to cover services related to 21st Century/Cayman's marketing of the Rentar fuel catalyst product.

While acknowledging the existence of these contractual relationships, Georgas today denies ever authorizing Hoban to act as his individual agent, and denies ever representing to Bluesky or anyone else that Hoban was the agent or representative of Georgas or 21st Century/Cayman.

On June 28, 2010, Rentar introduced Ansari to Hoban in a telephone conference call. At the conclusion of the call, at 5:50 p.m., Hoban emailed to Georgas a memorandum captioned "Summary of call with Rentar's Indian Distributor" relaying the high points of the exchange.

5

Hoban stated that Ansari had agreed to work with 21st Century/Cayman "on all THEIR deals including the bus company." He explained that Ansari had been working with the Indian bus company for two years, but faced delays when the company management changed hands; that Ansari admitted his contacts and local representatives were at a "much lower level" than 21st Century/Cayman's contacts, and that Ansari had agreed to travel to West Palm Beach on July 8th "to sit down with Rentar and us to negotiate and sign an agreement to work together."

Hoban quipped that "Abid [Ansari]'s team is like a high school basketball player while we are offering LeBron James, yet he thinks that we should split all of India evenly." At the same time, Hoban said he explained to Ansari that "our Indian partners will insist that [Ansari's] people be shut out of all high level meetings in India" and that Ansari agreed to this arrangement. Hoban asked Georgas how he wanted to handle the meeting with Ansari on July 8th, noting that "Brian [Gibbons] seems to pushing that we split all of India with Abid while Richard [Ford] is open to us only working with Abid on projects where he adds value." Finally, Hoban advised Georgas that "[o]ur Indian Team has shown the Rentar briefing to both Indian and the Philippines government officials," who were both interested and wanted information on 21st Century/Cayman's pricing offers, concluding with the query, "How much should we markup our pricing to them?" [ECF 138-1, p. 6].

Approximately an hour later, at 6:59 p.m., Georgas responded with the following note:

Wow… very impressive Mike

I don't [sic] this Brian guy but he sounds myopic … Here is the long term plan confidentially... If we can land a large contract in India or other, we can buy out the majority shares in the company for a buck a share … they will be worth 25-50 bucks a share after a big contract is signed so it is very important not to tip anyone off that we are about to sign a big deal before we go after the parent … let's talk tomorrow about that and pricing
Greg

6

[ECF 138-1, p. 7]. At 7:18 p.m., Hoban answered, "Greg, our Indian team will know about a contract first and will only tell us."

On July 8, 2010, Ansari met with Joel Ratner (Rentar CEO), Richard Ford (Rentar President) and Mike Hoban – who allegedly identified himself as "the business agent" of Gregory Georgas [ECF 114-2, p. 2] -- at Rentar's West Palm Beach offices to discuss and negotiate the terms of an APSRTC bus venture between Bluesky and 21st Century/Cayman.

There is a dispute between the parties as to whether Hoban consulted with Georgas by telephone during the course of this meeting. In an affidavit dated July 2013 filed in this case, Georgas denies participating in the meeting, denies that anyone from 21st Century/Cayman was present when the APSRTC profit sharing agreement was presented to Bluesky, and denies that he ever met anyone associated with Bluesky until after the instant lawsuit was filed [ECF 106-2, p. 4].[4] Ansari, however, contends that Hoban initiated the meeting with a description of the involvement that Georgas wanted on the APSRTC bus venture, and then left the room, saying "I want to let Greg know what is going on." Hoban returned shortly, talked to Ansari, and then left the room with Ford,

---

[4] While not part of the current summary judgment record, in an affidavit filed by Georgas in prior related litigation between the parties filed in Texas, Georgas acknowledged at least one direct telephone contact with Ansari regarding the Indian bus venture sometime in July 2010:

> In or around July 2010, Rentar asked me, as the managing Member of 21st Century [21st Century/Cayman] to take part in a telephone conference call with it and Abid Ansari from Bluesky. Neither I nor 21st Century initiated the telephone call, nor did we call Bluesky. I was in Florida at the time of the call. I do not know where Mr. Ansari was located at the time of the call. During the call, the parties discussed an agreement between Bluesky and 21st Century to split profits on the sales of a specific Rentar product to a particular Indian client. The agreement called for Rentar to decide any disputes between Bluesky and 21st Century. Shortly after the call, I was informed by Rentar that Bluesky would not agree to share profits with 21st Century as discussed during the telephone conference call.

[ECF 169-1].

7

again saying he wanted to speak further with Georgas. When Hoban and Ford returned ten minutes later, they presented a document signed by Georgas and post-dated July 9, 2010. At that point Ansari signed the document [ECF 114-2].

The July 9, 2010 writing, captioned "Agreement," running between 21st Century/Cayman and Bluesky, reflects the contracting parties' agreement to "work[] together on selling the 1.5 Rentar Catalyst to APSRTC" [the bus deal], and to "share the profits on a fifty/fifty basis" [106-2, p. 21]. The agreement bears the signature of Abid Ansari as representative of Bluesky, and Gregory Georgas as representative of 21st Century/Cayman. The next day, July 10, 2010, these same parties signed another "Agreement" identical in form and text to the July 9th version, only this time adding a second paragraph expressing the parties' assent to submission of any performance disputes to Rentar as final arbiter.[5]

Ansari was not told and was unaware at this time that Georgas had recently purchased 100,000 shares of Rentar stock, and held an option to buy an additional 400,000 shares before the end of the year, or that 21st Century/Cayman was a competing Rentar distributor with non-exclusive rights in India. Ignorant of the fact that Georgas was potentially poised to take over Rentar, or that 21st Century/Cayman was by then a direct competitor of Bluesky in the Indian market, Ansari was receptive to the Bluesky-21st Century/Cayman joint venture proposed by Rentar, and agreed to cooperate with Georgas and 21st Century/Cayman by sharing the valuable marketing data Bluesky had collected on the Indian market over the three years of its distributorship in order to promote the parties' mutually beneficial interests in closing on the APSRTC bus deal.

---

[5] This clause recited, "Should a dispute occur between the above parties it is agreed that [Rentar] will review all information in regard to the dispute, and will make a decision which will be final and accepted by both parties."

After the agreement was signed, Hoban introduced Ansari to Venkat and Ravi Tangirala ("the Tangirala brothers") as persons with helpful Indian political connections, claiming that they were the nephews of Dr. CVSK Sarma, an important Indian government official (a statement which later proved untrue). A lengthy email exchange between Ansari, Hoban, Georgas, and the Tangirala brothers followed, in which Ansari was asked to share his Indian market research field data and customer lists with the Tangirala brothers and Hoban. Ansari complied, believing that the information was sought in good faith by 21st Century/Cayman in furtherance of the parties' joint bus company venture and for no other purpose beyond their mutually beneficial interests in closing on the APSRTC bus deal.

Ansari's cooperation with Georgas' designated associates continued into early September 2010, when Hoban asked Ansari to answer the "many questions" of Venkat Tangirala regarding Bluesky's Indian contacts and the performance of the Rentar catalyst product in Bluesky's Indian field tests. Ansari spoke at length with Tangirala, and also provided him with pictures of the Rentar product installed on APSRTC buses and other installations, emission reports, installation instructions, methodology for monitoring fuel consumption in different applications; price points for all commercial applications, and leasing and selling market strategies based on fuel usage and savings. Shortly after this exchange, Ansari delivered a Rentar fuel catalyst to Venkat Tangirala, which Tangirala had requested for the ostensible purpose of presenting to the "top brass" at APSRTC. After delivering the item, and working under the assumption that Venkat had requested the item in good faith and in furtherance of the Bluesky - 21st Century/Cayman joint venture, Ansari learned that Venkat did not present the unit to APSRTC, but instead delivered it to A.J. Prasad, the

9

chairman of HBL, a company initially contacted by Bluesky. [The Chairman of HBL later showed Ansari the product which carried Bluesky's serial number and company label.]

In this same time frame, mid-September 2010, Georgas approached Rentar CEO Joel Ratner in an effort to have 21st Century/Cayman designated as Rentar's exclusive distributor in India. In making this overture, Georgas asked whether there was any contractual impediment to his proposal arising from Rentar's existing contractual relationship with Bluesky [Georgas affidavit ; ECF 106-2, p 5]. In response, Ratner assured Georgas that Bluesky did not have an exclusive right to market the product in India, or anywhere else for that matter, and that Rentar was free to designate 21st Century/Cayman as its exclusive distributor for India. Ratner sent Georgas confirming emails to this effect on September 13 and 15, 2010, and also forwarded a copy of the Bluesky MDA to Georgas.

On September 30, 2010, Rentar entered into a formal "Agency Agreement" with 21st Century/Cayman and the Tangirala brothers, designating 21st Century/Cayman as Rentar's exclusive marketing agent in India. Shortly after, Georgas claims he came to believe "it would be better to conduct business with Rentar through a United States corporation, rather than a foreign entity," and, therefore, on October 7, 2010, he formed a new company called 21st Century Planet Fund LLC ("21st Century/Delaware"), a Delaware limited liability company. On October 8, 2010, Georgas asked Rentar to substitute 21st Century/Delaware for 21st Century/Cayman as a party to an Amended Agency Agreement, and the requested substitution was promptly effected.

Ansari did not learn that Rentar had entered into a distributorship agreement with a Georgas-related entity until September 22, 2010.

On October 4, 2010, Rentar issued written notice of its intent not to renew the Bluesky MDA, effectively terminating the contractual relationship between these two entities. This lawsuit ensued.

10

## II. Issues on Summary Judgment

Defendants Georgas and 21st Century/Delaware seek entry of final summary judgment in their favor on all claims contending (1) there is no evidence that Georgas engaged in any conduct that would support a claim against him personally for fraud by commission or omission, where he did not labor under any obligation to disclose his relationship with Rentar or the existence of 21st Century/Cayman's non-exclusive Indian distributorship at the time 21st Century/Cayman contracted with Bluesky on the APSRTC bus venture; (2) there is no evidence of a civil conspiracy involving Georgas or 21st Century/Delaware (the only Georgas-related entity named as defendant) and the other named defendants in the suit; (3) plaintiff is unable to state or prove any viable legal claim against Georgas or 21st Century/Delaware for tortious interference with Bluesky's contractual arrangement with Rentar, where Bluesky had a "nonexclusive" distributorship agreement which (a) did not specifically include the territory of India and (b) was terminable at will of either party, and further, where Rentar allegedly made the decision to end plaintiff's distributorship before Georgas ever met anyone from Rentar; and (4) there is no evidence that Georgas or 21st Century/Delaware were unjustly enriched by the marketing information which Ansari voluntarily shared with the Tangirala brothers and Hoban in the course of Bluesky's performance under the APSRTC bus venture. Defendants contend that the plaintiff shared this information for its own financial benefit, in performance of its own contractual obligations, thereby defeating any claim for unjust enrichment.

## III. DISCUSSION

To create a joint venture, in addition to the elements required to form a basic contract, the following essential elements must be proven: (1) a community of interest in the performance of a common purpose; (2) joint control or right of control; (3) a joint proprietary interest in or right to

11

control the subject matter of the claimed joint venture; (4) a right to share in the profits, and (5) a duty to share in any losses which may be sustained. *King v. Baptist Hospital of Miami, Inc.*, 878 So.3d 39 (Fla. 3d DCA 2012); *Conklin Shows Inc. v. Dept. of Revenue,* 684 So.2d 328 (Fla. 4th DCA 1996). Joint venture agreements are not required to be in writing. *De Ribeaux v. Del Valle*, 531 So.2d 992 (Fla. 3d DCA 1988).

If a joint venture agreement exists, the partners owe a fiduciary duty to each other, *Sheridan Healthcorp, Inc. v Amko*, 993 So.2d 167 (Fla. 4th DCA 2008), and this includes a duty to disclose material facts to one another. *Williams v. Dresser Industries, Inc.*, 120 F.3d 1163 (11th Cir. 1997) (Ga. law); *Malkus v Gaines*, 434 So.2d 957 (Fla. 3d DCA 1983) (joint adventurers, like co-partners, owe to one another, so long as the relationship continues, the duty of the highest loyalty, including a duty to disclose all essential particulars, and a duty to refrain from acting in self-interest against the interest of the other). *See generally New Vista Development Corp. v. Doral Terrace Associates, Ltd.*, 878 So.2d 462 (Fla. 3d DCA 2004); *Gossett v. St. Paul Fire & Marine Ins. Co.*, 427 So.2d 386, 387 (Fla. 4th DCA 1983)("There is a fiduciary relationship between joint venturers requiring that they deal with each other in utmost good faith, fairness and honesty).

### A. FRAUD-BASED CLAIMS

In this case, the court finds sufficient evidence to create a genuine issue of material fact on the question of whether the July 9, 2010 and July 10, 2010 Agreements between Bluesky and 21st Century/Cayman were ancillary to or memorialized a "joint venture" which gave rise to a special relationship between the parties and a corresponding fiduciary duty on the part of the co-venturers to disclose material information to each other.

The court also finds a genuine issue of material fact on the question of whether Georgas may be personally liable to plaintiff for breach of such fiduciary duties owed by 21st Century/Cayman, on theory that Georgas wrongfully withheld material information from Bluesky and Ansari regarding (1) 21st Century/Cayman's status as a Rentar distributor with non-exclusive rights to distribute in India, with designs on acquiring an exclusive Rentar distributorship in India; (2) Georgas' position as a Rentar stockholder with an open option to purchase an additional 400,000 shares of Rentar stock before the end of calendar year 2010 and possible designs on a Rentar take-over.

Georgas contends there is no evidence to support an adverse finding on his personal liability for the alleged torts of 21st Century/ Cayman where there is no evidence that he operated as the alter ego of 21st Century/Cayman.  At this juncture, the court need not reach the issue of whether there is sufficient evidence of Georgas' domination of 21st Century/Cayman, with respect to the transaction at issue, for a reasonable jury to find for Bluesky on this issue, however, because it finds sufficient evidence to raise a fact question on whether Georgas is personally liable as a knowing participant or aider and abettor in the alleged breach of fiduciary duty.

Where a third party knowingly participates in the breach of a fiduciary duty, such third party becomes a joint tortfeasor with the fiduciary, and is liable as such. *Martin Co. v. Commercial Chemists, Inc.,* 213 So.2d 477 (Fla. 4th DCA 1968).  This is sometimes referred to as aiding and abetting a breach of fiduciary duty, or "participatory liability."  In order to state such a claim, a plaintiff must allege: (1) the existence of a fiduciary duty; (2) breach of the duty by the fiduciary; (3) that the defendant, who is not a fiduciary, knowingly participated in the breach, and (4) that damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary. *Mukamal v.*

13

*Bakes,* 378 Fed. Appx. 890 (11th Cir. 2010) (Del. law); *In re Caribbean K. Line Ltd.*, 288 B.R. 908, 919 (S.D. Fla. 2002); *Duke Energy Int'l LLC v. Napoli*, 748 F. Supp. 2d 656 (S.D. Tex. 2010).

The record in this case reveals evidence sufficient to create a genuine issue of material fact on each of these elements: There are sufficient facts from which a reasonable jury could find or infer that Georgas, a sophisticated businessman, knew of Bluesky's relationship with a co-venture, 21st Century/Cayman; that Georgas was aware of the terms of the agreement; that Georgas caused the breach of fiduciary duties owed under that agreement by withholding relevant information about 21st Century/Cayman's relationship with Rentar and Georgas' relationship to Rentar as stockholder, and by directing and encouraging others on his "India team" (the Tangirala brothers and Hoban) to ply Ansari for valuable marketing information collected during the three-year term of the Bluesky distributorship under the guise of furthering the Bluesky -21st Century/Cayman joint venture on the APSRTC bus deal; that Georgas was motivated by a desire to obtain a secret competitive advantage over Bluesky, for the benefit of 21st Century/Cayman, which he controlled as sole, managing member, and later for the benefit of 21st Century/Delaware, which he also controlled as sole, managing member; that Georgas accepted the benefit of the breach by taking the proprietary information and using it to enhance the bargaining leverage of 21st Century/Cayman to achieve the status of Rentar's exclusive distributor in India, and later passing this advantage on to 21st Century/Delaware, which was apparently created for the sole purpose of replacing 21st Century/Cayman in the Rentar distributorship agreement.

Because the record contains sufficient evidence to create a genuine issue of material fact on the question of whether Georgas may be personally liable as a knowing participant, or aider and abettor, in a breach of fiduciary duty owed by 21st Century/Cayman, the court need not determine at

14

this juncture whether the evidence in these proceedings also supports a finding of alter ego. *See e.g. SCS Communications, Inc. v. The Herrick Co.*, 360 F.3d 329 (2nd Cir. 2004) (evidence sufficient to show principal of co-venture knowingly participated in breach of fiduciary duty owed to other joint venture which occurred when co-venturer excluded joint venturer from acquisition that was the purpose of the joint venture, obviating need to determine whether principal could be personally liable as alter ego of co-venturer).

### B.   TORTIOUS INTERFERENCE

As a threshold matter, the court finds the summary judgment evidence sufficient to create a genuine issue of fact on the question of whether the Bluesky MDA was effectively modified by a post-contract course of dealing and verbal communications between Bluesky and Rentar, so as to expand Bluesky's designated non-exclusive marketing territories to include India. Thus, the remaining issue on summary judgment is whether the evidence is sufficient to create a genuine issue of material fact on the question of whether Georgas and 21st Century/Delaware committed acts which tortiously interfered with the rights of Bluesky under that Rentar contract, as modified.

In Florida, a plaintiff must prove three elements to recover on a claim for tortious interference: (1) the existence of a business relationship in which the plaintiff has legal rights; (2) an intentional and unjustified interference with the relationship by the defendant, and (3) damage to plaintiff as a result. *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F. 2d 1526 (11th Cir. 1985). In this case, defendants argue they are entitled to summary judgment as a matter of law on this claim for two reasons: first, defendants assert that their conduct was protected by the competition privilege, i.e. they claim to have participated in an "arm's length" transaction with Bluesky, owing no duties of disclosure, and employing no improper means to secure the exclusive Rentar distributorship; second,

15

they contend, as a matter of law, there can be no action for tortious interference with a contract which is terminable at will.

The general rule is that an action for tortious interference will not lie where a party tortiously interferes with a contract terminable at will. *Greenberg v. Mt. Sinai Medical Center*, 629 So.2d 252 (Fla. 3d DCA 1994). This follows because when a contract is terminable at will there is only an expectancy that the relationship will continue, and, in such a situation, a competitor has a privilege of interference in order to acquire the business for itself. *Id.,* citing *Wackenhut Corp v. Maimone*, 389 So.2d 656 (Fla. 4th DCA 1980*), rev den.,* 411 So.2d 383 (Fla. 1981).

Here, Bluesky alleges it had an established, advantageous business relation with Rentar; that defendants knew of the relationship, that defendants intentionally and unjustifiably interfered with the relationship and that Bluesky suffered damages as a result. With this *prima facie* showing of the claim, the burden shifts to defendants to justify interference by asserting the competition privilege.

To establish the competition privilege, defendants must show: (1) that the Bluesky/Rentar relationship concerned a matter involved in the competition between defendants and Bluesky (distributorship rights for Rentar); (2) that defendants did not employ improper means to interfere with the Bluesky/Rentar relationship; (3) that defendants did not intend to create or continue an illegal restraint of competition, and (4) that the defendants' purpose was at least in part to advance their interest in competing with the plaintiff.

Bluesky claims that the competition privilege does not protect the defendants because they used improper means to acquire an exclusive Indian distributorship with Rentar. "Improper means" which will defeat the competition privilege include physical violence, misrepresentations, intimidation, conspiratorial conduct, illegal conduct and threats of illegal conduct. *G.M. Brod & Co.*

16

*v. U.S. Home Corp.*, 759 F. 2d 1526 (11th Cir. 1985); *Morsani v. Major League Baseball,* 663 So.2d 653 (Fla. 2d DCA 1995); Fla. Std. Jury Instructions in Civil Cases § 408.6 (2010). The improper means of "misrepresentations" may include a false statement or omission of material fact. *Boldstar Technical LLC v. Home Depot*, 517 F. Supp. 2d 1283 (S.D. Fla. 2007); *Berg v. Capo*, 994 So.2d 322 (Fla. 3d DCA 2007). Ultimately, to determine whether interference is justified or privileged requires a commonsense consideration of whether the conduct was "sanctioned by the rules of the game" and what is "right and just" under the circumstances. *Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc.,* 384 So.2d 303, 306 (Fla. 5th DCA 1980), citing *Grillo v. Board of Realtors of Plainfield Area*, 91 N.J. Super 202, 219 A.2d 634 (1966).

Bluesky asserts that Georgas and 21st Century/Cayman made material misrepresentations to Bluesky by failing to disclose the existence of 21st Century/Cayman's relationship with Rentar, or the relationship of Georgas to Rentar, and by affirmatively misrepresenting to Bluesky (or causing others to affirmatively misstate) that Bluesky's marketing data was needed by Georgas, 21st Century/Cayman, the Tangirala brothers, and Hoban in order to better the position of Bluesky and 21st Century/Cayman in closing on the APSTRC bus deal, for their mutually beneficial economic benefit, and pursuant to their common purpose and alignment under the Bluesky - 21st Century/Cayman venture.

The court finds sufficient evidence to create a genuine issue of material fact on the question of whether the defendants used improper means to compete for business against Bluesky: If a fact finder were to determine that Bluesky and 21st Century/Cayman were joint venturers, this would give rise to corresponding fiduciary duties not to compete and instead to collaborate with each other. Under the July 9, 2010 Agreement, Bluesky and 21st Century/Cayman did agree to join their

17

resources and collaborate in pursuit of a potentially lucrative sale of Rentar products to the Indian Government. At the same time, there is evidence that Bluesky and its principal were kept in the dark at this material juncture regarding the adverse interests and competitive position of Georgas and 21st Century/Cayman vis-à-vis the Rentar distributorship in India.

With this background, the court finds sufficient evidence to create an issue of fact on whether defendants' interference was improper and hence unjustified, where misrepresentations attributable to these defendants may have been used to fraudulently induce Bluesky to voluntarily part with valuable proprietary information which was then used to advance the position of 21st Century/Cayman as exclusive distributor for Rentar in India, necessarily causing the elimination of Bluesky as a distributor for Rentar in India at the precise point in time when Bluesky's distributorship agreement was otherwise due for automatic renewal (October 15, 2010). *See Ahern v. Boeing Co.,* 701 F.2d 142 (11th Cir. 1983) (fact that defendant was motivated only by competitive interest and that interference was with at-will contract did not preclude cause of action for tortious interference, where defendant corporation went much further than mere solicitation that would be protected under Florida's privilege of competition, and ultimately entered into contract interfering with existing at-will contract of plaintiff); *Ellis Rubin, P.A. v. Alarcon*, 892 So.2d 501, 503 (Fla. 3d DCA 2004) (attorneys stated claim for tortious interference against third party where third party allegedly colluded with client by falsely representing that an action had been dropped while concealing a settlement that would have entitled attorneys to contingency fee).

### C. UNJUST ENRICHMENT

The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on defendant; (2) defendant has knowledge of the benefit; (3) defendant has accepted or

18

retained the benefit conferred and (4) the circumstances are such it would be inequitable for defendant to retain the benefit without paying fair value for it. *Media Services Group, Inc. v. Bay Cities Communications, Inc.* 237 F.3d 1326 (11th Cir. 2001).

Defendants claim that there is no evidence Bluesky has conferred any benefit on Georgas, personally, or 21st Century/Delaware, the entity which replaced 21st Century/Cayman as the exclusive marketing agent for Rentar in India. The court disagrees. The evidence is susceptible to reasonable inference that defendants unjustly received from plaintiff valuable proprietary marketing data, customer lists and the good will of plaintiff's Indian customers, information which was of value to Georgas in persuading Rentar to convert 21st Century/Cayman's non-exclusive Indian distributorship arrangement into an exclusive one, an arrangement which ultimately benefited 21st Century/Delaware when Georgas caused the newly created Delaware entity to be substituted in the stead of 21st Century/Cayman under the exclusive Rentar Agency Agreement. As the sole, managing member of both the Cayman Island and Delaware entities, Georgas stood to benefit from the receipt of this data and the useful role it played in securing an exclusive Rentar distributorship in India for the companies he controlled, and 21st Century/Delaware stood to benefit as the entity ultimately designated, through Georgas, as Rentar's exclusive distributor in India.

Finally, defendants contend that the unjust enrichment claim is unavailing as a matter of law because the parties entered into an express written contract with each other. While as a general rule an action for unjust enrichment will not lie where the parties have an express contract governing the same subject matter, *Weaver v. Mateer and Harbert, P.A.,* 523 Fed. Appx 565 (11th Cir. 2013), this general precept does not apply here because Bluesky's unjust enrichment claim is not based on an alleged breach of the July 9th or July 10th APSRTC profit sharing agreement (e.g. an alleged failure to

19

perform by payment of profits due or otherwise); rather, the unjust enrichment claim hinges on the theory that defendants directly or indirectly participated in an abuse of fiduciary duties arising out of the APSRTC bus venture in order to surreptitiously induce Bluesky to part with valuable proprietary information which defendants sought and then used to poise 21st Century/Cayman (and later 21st Century/Delaware) as a well-armed candidate for award of a coveted exclusive Rentar distributorship in India.

Here, there was no express contract covering the purchase of plaintiff's proprietary data for value. The express agreement between defendants and Bluesky pertained to allocation of profits generated by the APSRTC bus venture. The unjust enrichment claim does out arise out of the parties' performance or breach of the express agreement between them, and therefore states a potentially valid cause of action. *See e.g. Kane v. Stewart Tilghman Fox & Bianchi, P.A,* 85 So.3d 1112 (Fla. 4th DCA 2012).

## IV. DECRETAL PROVISIONS

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

The defendants' converted motion for summary judgment [ECF 32; 103-106] is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 4th day of December, 2013.

*/s/ Daniel T. P. Hurley*
United States District Judge
Southern District of Florida

cc. all counsel